## Pacific Electric Railway Co. v. Wetherill, Inc.

*I. J.* and *D. W. Van Artsdalen,* for plaintiff.

*G. T. Kelton,* for defendant.

BIESTER, J., April 26, 1954.—The above matter is before us by reason of plaintiff's having filed preliminary objections to the new matter contained in defendant's answer.

The action was instituted for the collection of alleged unpaid freight charges of $808.09 on a shipment of lumber transported in interstate commerce from California to Bristol, Bucks County, Pa., the consignor being the Ralph Hull Lumber Company of California, and the consignee being the Stitzinger Lumber Company of Bristol. The complaint further alleges that the consignee directed the lumber to be delivered to defendant and that defendant accepted the lumber and thus became liable for the freight charges thereon.

Defendant's answer, under new matter, asserts that the lumber was shipped under a uniform straight bill of lading, which directed plaintiff and its connecting

carriers to make stops at Beaver Falls, Pa., and Rohrerstown, Pa., for partial unloading by the consignee; that such stops were in accordance with the direction of the consignee; that at no time had defendant any interest as consignee, owner, reconsignee, assignee or otherwise in any of the lumber so unloaded at the direction of the consignee; that upon arrival at Bristol, Pa., approximately three fourths of the lumber had previously been unloaded.

It is further averred that defendant accepted the shipment on November 12, 1951, relying on the statement in the bill of lading that the freight was to be prepaid by the consignor, and further relying upon the representation of plaintiff's delivering carrier that the freight charges had, in fact, been prepaid by the consignor; that, relying upon the terms of the bill of lading and the representation of plaintiff's delivering carrier, defendant paid the consignee, the Stitzinger Lumber Company, the full amount due for the lumber delivered to defendant and defendant's portion of the total freight charges.

Plaintiff contends by its pleading, and has advanced by argument, that these facts so averred in defendant's answer do not constitute a valid defense.

The contention of defendant is twofold: First, that plaintiff is estopped from collecting any of the freight charges by reason of its representations that the freight charges had been prepaid and, secondly, that if we find estoppel to be unavailable as a defense, defendant nevertheless exercised no such dominion or control over the shipment as to justify its being required to pay all of the freight charges thereon.

As the shipment was interstate, the rights of the parties are governed by the Interstate Commerce Act of August 2, 1949, 63 Stat. at L. 485, 49 U. S. C. A. §1, et seq., and its amendments: Reading Co. v. Sobelman, 144 Pa. Superior Ct. 270.

Amongst the sections of the act pertinent to our problem are the following, §2:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or received from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

"§3, Par. 2: No carrier by railroad subject to the provisions of this chapter shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the commission may from time to time prescribe to assure prompt payment of all such rates and charges and to prevent unjust discrimination: Provided, That the provisions of this paragraph shall not be construed to prohibit any carrier from extending credit in connection with rates and charges on freight transported for the United States, for any department, bureau, or agency thereof, or for any State or Territory or political subdivision thereof, or for the District of Columbia."

"§6, Par. 7: No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier

have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The question before us is whether, under the terms of the Interstate Commerce Act, as such act has been construed by the courts, defendant has set up a valid defense to plaintiff's claim.

On the question of estoppel there appears to be no doubt that the leading case is that of Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, 250 U. S. 577, 63 L. Ed. 1151. In that case the railroad company delivered to Fink two boxes of Indian relics, shipped to him at Dayton, Ohio, from Los Angeles, Calif., the way bill specifying charges in the amount of $15, which sum Fink paid upon receipt of the goods. The tariff rates filed with the Interstate Commerce Commission so classified this merchandise that the transportation charges should have been $30 instead of $15. It was for the difference that the action was prosecuted. The court held that the purpose of the act to regulate interstate commerce was "to provide one rate for all shipments of like character, and to make the only legal charge for the transportation of goods in interstate commerce the rate duly filed with the commission".

It was, therefore, held to be unlawful for the carrier to depart from the tariff rates filed and to receive compensation less than the sum fixed by such tariff rates, there being an assumption that the consignee must have known the law and to have understood that the rate charged could only lawfully be the one fixed by the tariff schedule, and that he was only entitled to the merchandise when he paid for the transportation thereof the sum specified as required by the statute. It follows, therefore, said the court, that in such case, the consignee cannot successfully invoke the principle of estoppel as otherwise estoppel would become the means of successfully avoiding the requirement of the act as to legal rates.

This case has been consistently followed by all of the courts when the question before it is the attempt to invoke estoppel when a mistake of fact has occurred as to the rate charged. Pennsylvania's appellate courts have also uniformly supported this rule: Philadelphia & Reading Ry. Co. v. Baer, 56 Pa. Superior Ct. 307; P. R. R. Co. v. DeMarto, 90 Pa. Superior Ct. 216, 219; Pa. R. R. Co. v. A. J. Cameron & Co., 78 Pa. Superior Ct. 497; West Jersey & Seashore R. R. Co. v. Whiting Lumber Co., 71 Pa. Superior Ct. 161.

There is, however, a great variance of opinion amongst our courts as to whether the doctrine of estoppel may be invoked where the consignee, or other party exercising dominion over the goods, is misled by the carrier into believing that the freight charges have been prepaid when, in fact, they have not been so paid. The question then arises whether such cases are distinguishable from the Fink case or whether the same line of reasoning should be applied.

The leading case holding that a situation such as the present is distinguishable on its facts from the Fink case is that of Davis v. Akron Feed & Milling

Co., 296 Fed. 675. In that case the carrier erroneously told defendant that freight had been paid to a certain point, and defendant paid the freight charges from that point and paid the seller the balance of the purchase price after deducting the freight paid. Although agreeing with the laws as set forth in the Fink case and that of New York Central & Hudson River Railroad Co. v. York & Whitney Co., 256 U. S. 406; 65 L. Ed. 1016, the court concluded that the question raised must be determined upon wholly different considerations. The court says, page 677:

"The consignee in this case had no knowledge, nor had it equal means with the railway company of acquiring knowledge, that the freight from Kansas City to Chicago had not been paid. No circumstance whatever is suggested in the agreed statement of facts that would put the consignee upon inquiry. The railway company knew, or ought to have known, that this freight was not paid, and, when it expressly stated that it had been paid, the consignee relied upon that representation, instead of refusing to accept the consignment until it had made full inquiry with reference to that fact, which inquiry would involve, not only delay, but expense, including demurrage. Nor had the consignee any more reliable source of information than the railway company itself."

In further discussing the question involved, the court indicates that the Fink case and similar cases are so decided upon the theory that the shipper and consignee are conclusively presumed to know the published scheduled rate and, therefore, may not rely upon the representation made by the carrier, but that in such cases as the present there is no presumption that the freight has not been paid and it is not a matter of public knowledge.

To the same effect is Cincinnati Northern R. Co. v.

Beveridge et al., 8 F. 2d 372. After quoting at length from the Davis case, the court holds that the mistake of the railroad company in issuing a prepaid bill of lading, when, in fact, such freight had not been paid, although unavailing in discharge of its obligation under the law to collect the full transportation charges, the obligation thus imposed does not "go to the extent of requiring payment by a purchaser of the goods at destination who, relying upon the railroad company's representation of payment, accepts the same, for to do so would be to make a contract for him which he himself had not made".

The only Pennsylvania case that we have been able to discover precisely on the subject involved, is that of Pennsylvania Railroad Co. v. Seiff, 24 D. & C. 658. In that case the consignee sold a car of grapes to one Paskoff while the grapes were at Pittsburgh to be delivered at Uniontown, Pa., with all freight and charges prepaid. Defendant paid his vendor, Paskoff, for the grapes. When the car reached Uniontown, defendant then having been advised that the freight had been prepaid, began unloading the car, but when it was practically unloaded, he was notified by the carrier that the freight had, in fact, not been paid and that he would be required to pay it.

The court held that plaintiff was estopped from collecting the freight charges, distinguishing such a situation from that in the Fink case as follows (page 663) :

"There can be no estoppel where a carrier erroneously or intentionally releases the shipment upon payment of a lower rate than the tariff rate, since the consignee, or any other party interested, is conclusively presumed to know what the true tariff rate is and consequently cannot lawfully rely on any representations of the railroad company that the proper rate has been collected in this particular instance. On

the other hand, there is nothing in these statutes which prevents a carrier from contracting to look to any particular party in interest in a shipment solely for the collection of the full rate as long as there is no discrimination with the amount of the charge. A consignee is not compelled to accept delivery of goods shipped to him, and no case has been cited to us which holds that a carrier may not lawfully contract with the consignee for the acceptance of a shipment with the understanding that the full tariff rate will be collected from the consignor or some other party in interest. This freedom of contract on the part of the carrier, so long as there is no actual discrimination in the amount of the rate charged, is clearly recognized in the opinion of Mr. Justice Brandeis in Louisville & Nashville R. R. Co. vs. Central Iron & Coal Co., 265 U. S. 59."

See, also, American Express Co. v. Sweeney et al., 283 Fed. 691; Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. McKenzie Lumber Co., 112 Ohio 80, 147 N. E. 8.

As against these cases are a number of decisions throughout the United States which, under circumstances similar to the present, hold that the Fink case is applicable and that there can be no estoppel under such circumstances. Among such cases are New York, N. H. & H. R. Co. v. Lord & Spencer, 273 Mass. 583, 174 N. E. 179; Chicago & N. W. Ry. Co. v. J. I. Case Plow Works, 173 Wis. 237, 180 N. W. 846; Great Northern Ry. Co. v. Hyder, 279 Fed. 783; Western & Atlantic R. Co. et al. v. Underwood, 281 Fed. 891; Pa. R. Co. v. L. N. White & Co., Inc., 116 N. Y. S. 2d 361; Southern Pacific Co. v. Wheaton Brass Works, 5 N. J. 594, 76 A. 2d 890; Central Warehouse Co. v. Chicago R. I. & P. Ry. Co., 20 F. 2d 828; F. Burkhart Mfg. Co. v. Fort Worth & D. C. Ry. Co., 149 F. 2d 909; Houston & T. C. R. Co. v. Johnson, 41 S. W. 2d 14 (Texas).

Perhaps the most clear dissertation of the rationale

under which such cases as the Fink case are held to be controlling under the facts similar to the case before us is contained in Great Northern Ry. Co. v. Hyder, supra. In discussing the Fink case (page 785) the court says:

"In reaching a conclusion on this question and the effect of the foregoing decision, it is important to keep in mind the nature of the mistake made by the carrier and the consignee. In the present case, as in the above case, the mistake here made was not one of law, but of fact. At the time of the delivery of the freight in question the carrier had a lien, despite the mistake made in delivering it. In delivering and surrendering the goods to the consignee, plaintiff lost its lien thereon. While the mistake of the carrier and consignee may not have been in all things mutual, they were mutually mistaken in acting in the belief that the freight charges had been fully paid.

"The legal rate is the posted and published rate. It was that of which the consignee was obliged to take notice. The mistake as between the rate asked and the legal rate (the filed and posted tariff rate) is a mistake of fact—the consignee not knowing that the posted and published rate was higher than that paid by him. Therefore the decision would appear controlling of the present cause, for, if the doctrine of estoppel cannot be invoked, where the consignee paid the demanded rate, thinking it was the filed and posted rate, the carrier thereby losing its lien for the unpaid portion of the freight, it is not perceived why the consignee, in receiving the goods, acting under a mistaken belief that the shipper had fully paid the freight, can do so. It may be argued that there is no analogy between the two stated cases, as the world is bound by the posted and published rate, while the consignee is not bound to know whether it has been fully paid or not. But the distinction is more apparent than real.

"The consignee, in refusing payment, is relying on the plaintiff's being estopped by its conduct. The shipper, the carrier, and the consignee are all agents and trustees for the public, and no complications arising out of the agreements between them, or shuffling, should defeat the purpose of the act requiring the full and exact payment of the freight as fixed by the filed, posted, and published tariff.

"The railroad, suing in its interest, alone, might be estopped; but, in suing under the statute, it is suing as a trustee for the protection of the public. The public, in whose interest, as well as its own, the carrier has a lien on the undelivered freight for the full rate, is not estopped, because it did no act and made no representation on which the consignee relied, and, when the consignee accepted the goods, it deprived the public of that lien. It follows that the consignee, because of such act, still remains liable to the carrier, who sues in the public's interest, for the value of the right destroyed."

In the case of Central Warehouse Co. v. Chicago R. I. & P. Ry. Co., 20 F. 2d 828, defendant was the notify party and no freight charges were demanded of it. It accepted the shipment in reliance upon the prepaid endorsement of the bill of lading, it afterward being discovered that the freight charges were not, in fact, prepaid, suit was instituted against the notify party.

The court held that defendant, although not the consignee, had the same title as that of the consignee, since the bill of lading was endorsed to it, and that whatever obligations were imposed upon the original party to the contract of carriage were necessarily assumed by the notify party "when it accepted the bill of lading and demanded the possession of the car of sugar". In discussing the case, the court says (page 829):

"The Supreme Court in considering the statute has determined that the carrier has a lien for the usual charge, and that the consignee in accepting the shipment in any case assumes the obligation of discharging that lien. This obligation on the part of the consignee is not to be avoided because it imposes a hardship, or because he has relied upon the fact that the charges have been paid and changed his position to his detriment. The prime consideration that led to the enactment was deemed of such consequence to the public interest that individual cases of hardship ought not overcome the law.

"The initial carrier in this case by mistake caused the bill of lading to indicate that the freight charges had been paid by the consignor. The duty imposed upon the carrier by the act applicable to interstate shipments was to collect the lawful rate. This obligation was not only in its own interest, but in the interest of the public. It is not permitted to escape its duty by an oversight and thereby effect a discrimination. It is not within its power to so conduct itself that the plain terms of the statute will amount to nothing. The unintentional act of the carrier does not estop it from demanding payment of the lawful charge."

The latter group of cases holding that estoppel may not be invoked by the consignee, or the notify party exercising dominion over the shipment, appear to us to be more convincing than those few cases which hold to the contrary. The fact that in an individual case hardship may accrue to the individual consignee must be considered as subservient to the more compelling and fundamental principle that discrimination must be avoided, whether such discrimination be by a voluntary or an involuntary act of the parties involved.

". . .The parties are not in equity nor is the case to be decided by application of ordinary common-law

principles or by state law. Construction of the bills of lading and application of freight rates adopted by the Interstate Commerce Commission and prescribed by Congress in the public interest for interstate rail shipments, such as the one in question, presents a federal and not a state question and we are controlled by Federal law": Pa. R. Co. v. L. N. White & Co., supra.

Our conclusion that defendant may not invoke the doctrine of estoppel does not completely dispose of the question before us. In the instant case, defendant exercised control and dominion over but a fractional part of the entire shipment. As to that portion of the lumber delivered to the consignee prior to the car's arrival at Bristol, defendant, under no theory of law or fact with which we are familiar, accepted or exercised dominion thereover.

It must be understood that the liability of the consignor, consignee and notify party arise out of entirely different concepts. Our Superior Court in the case of Phila. & Reading Ry. Co. v. International Motor Co., 84 Pa. Superior Ct. 582, makes this distinction clear in the following language (pages 584 and 585) :

" 'Ordinarily the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and his obligation is ordinarily a primary one. This is true even when the bill of lading contains, as here, a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefore is inferred (that is, implied in fact), as a promise to pay for goods is implied when one orders them from a dealer'.

"The liability of a consignee is different. . . . 'This liability is imposed on the consignee, although not a party to the original contract of shipment, because the consignee accepts the property transported, know-

ing that it is subject to a lien for the charges arising from the transportation, knowing or charged with the knowledge of the lawful tariff rates thereon, and knowing or charged with knowledge that the carrier may not properly ask or receive less than the full tariff charges.' "

Or, stated in the language of P. R. R. Co. v. De-Marto, supra:

"The reason for this rule is that the consignee is presumed to accept the goods with knowledge that the carrier has a lien for transportation charges which is released by delivery in reliance on the consignee's implied promise arising from his acceptance of the merchandise. . . . In such case it is the acceptance of the merchandise from the carrier and the release of its lien which raises an implied obligation on the part of the purchaser to pay the transportation charges. The cases bearing on the subject show that the acceptance of the property from the carrier by the owner is the fact out of which the implied obligation to pay the freight charge arises."

The liability of the notify party is in the same category as that of the consignee, and arises out of his acceptance of the shipment or by the exercise of such dominion over it as is equivalent thereto. For, in such event, the notify party, in possession of an order bill of lading and accepting the shipment, becomes to all intents and purpose the consignee thereof. The mere fact, however, if it so be, that defendant was named as the notify party in the bill of lading does not operate to make him the consignee: Davis v. Richardson, 87 Pa. Superior Ct. 205.

Since the liability for freight charges arises as to the consignee and notify party by their acceptance of the goods or the exercising of dominion thereover, and since these factors are not present in the instant case as to the shipment in its entirety, we regard the new

matter as a substantive defense to at least a part of plaintiff's claim.

Although not disclosed by the pleadings, it has been argued to us that the freight charges are not divisible and that plaintiff will be unable to establish the proper allocation of the freight charges to defendant on that portion of the shipment which he received. Although this may well be so, we fail to see how this factor would justify a legal concept requiring defendant to pay all of the charges. It would appear from the pleadings that both the consignor and consignee, under the law, were liable for all of the freight charges and it may be that the purchasers of the lumber prior to its arrival in Bristol also became liable for their proportionate share of the freight charges, although this latter liability would be dependent upon the circumstances under which the lumber was delivered to or accepted by them. Whether plaintiff pursued its remedy against any of the parties we do not know, or if it did not, why it abstained from so doing. It may be that either or both the consignor or consignee are insolvent, but even if this be so, we find no reason thereon to penalize defendant.

In accordance with the views hereinbefore expressed we make the following

*Order*

Now, to wit, April 26, 1954, the preliminary objections affecting the right of defendant to invoke the doctrine of estoppel are sustained. The preliminary objections as to the allegations contained in new matter regarding the delivery of a part of the shipment of lumber to parties other than defendant are overruled and discharged, defendant, however, to have leave to file an answer to such new matter within 20 days from the filing of this opinion.